**FORM TO BE USED BY A PRISONER IN FILING A CIVIL RIGHTS COMPLAINT**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

(1) YONEL JEAN BAPTISTE 83407-004
    (Name of Plaintiff)          (Inmate Number)

USP-Beaumont, P.O. Box 26030
    (Address)

(2) _____
    (Name of Plaintiff)          (Inmate Number)

_____
    (Address)

(Each named party must be numbered,
 and all names must be printed or typed)

                    vs.

(1) KATHRYN MORRIS (PsyD) et al,

(2) MARWIN REEVES (TREATMENT SPEC.)

(3) L.J. ODDO (WARDEN)
    (Names of Defendants)

(Each named party must be numbered,
 and all names must be printed or typed)

FILED
SCRANTON
JUL 2 6 2018
PER _____
    DEPUTY CLERK

YET TO BE ASSIGNED
    (Case Number)

3:18-CV-1484

**CIVIL COMPLAINT**

TO BE FILED UNDER: _____ 42 U.S.C. § 1983 - STATE OFFICIALS
                    XX   28 U.S.C. § 1331 - FEDERAL OFFICIALS

## I.   PREVIOUS LAWSUITS

   A.   If you have filed any other lawsuits in federal court while a prisoner, please list the caption and case
        number including year, as well as the name of the judicial officer to whom it was assigned:

        YONEL JEAN BAPTISTE, PLAINTIFF, v. M. BARKER and C. SPURLOCK,

        DEFENDANTS.   CASE # 5:15-cv-522-0c-10PRL   JUDGE TERRELL

        HODGES ON JANUARY 30, 2016

        _____

1

II.   **EXHAUSTION OF ADMINISTRATIVE REMEDIES**

In order to proceed in federal court, you must fully exhaust any available administrative remedies as to each ground on which you request action.

A.   Is there a prisoner grievance procedure available at your present institution? XX Yes ___No

B.   Have you fully exhausted your available administrative remedies regarding each of your present claims? XX Yes ___No

C.   If your answer to "B" is <u>Yes</u>:

   1.   What steps did you take? <u>EXHAUSTED ALL AVAILABLE ADMINISTRAT-</u>
      <u>REMEDIES: 853236-F1,R1,A1, 858781-F1,R1,A1, 923400-F1,R1,A1</u>

   2.   What was the result? <u>853236-A1 WAS DENIED. 858781-A1 WAS</u>
      <u>NOT DENIED. 923400-A1 WAS NOT DENIED.</u>

D.   If your answer to "B" is <u>No</u>, explain why not: _____

_____

III.   **DEFENDANTS**

(1) Name of first defendant: <u>KATHRYN MORRIS (PsyD)</u>

Employed as <u>PSYCHOLOGIST</u> at <u>USP-ALLENWOOD</u>
Mailing address: <u>P.O Box 3500 WHITE DEER, PA 17887</u>
(2) Name of second defendant: <u>MARWIN REEVES</u>
Employed as <u>TREATMENT SPECIALIST</u> at <u>USP-ALLENWOOD</u>
Mailing address: <u>P.O. Box 3500 WHITE DEER, PA 17887</u>
(3) Name of third defendant: <u>J. Moroney</u>
Employed as <u>Case Manager</u> at <u>USP-ALLENWOOD</u>
Mailing address: <u>P.O. Box 3500 WHITE DEER, PA 17887</u>
(List any additional defendants, their employment, and addresses on extra sheets if necessary)

IV. **STATEMENT OF CLAIM**

(State here as briefly as possible the facts of your case. Describe how each defendant is involved, including dates and places. Do not give any legal arguments or cite any cases or statutes. Attach no more than three extra sheets if necessary.)

   1.   <u>**SEE PLAINTIFF'S ATTACHED SATAEMENT OF FACTS SUPPORTING HIS</u>
      <u>CLAIMS, SET OUT IN PARAGRAPHS 1-50**</u>

_____

2.   **SEE PLAINTIFF'S ATTACHED STATEMENT OF CLAIMS, SET OUT IN PARAGRAPHS 51 - 72**

3.

## V.   RELIEF

(State briefly exactly what you want the court to do for you.  Make no legal arguments.  Cite no cases or statutes.)

1.   THE PLAINTIFF PRAYS FOR DAMAGES FROM DEFENDANTS K. MORRIS, M. REEVES, MORONEY, RODARMEL, AND ODDO, IN THEIR INDIVIDUAL AND PRIVATE CAPACITY, AND/OR OFFICIAL CAPACITY, AS DEEMED FAIR AND EQUITABLE: THAT IS, MONETARY COMPENSATION DAMAGES AND/OR

PUNITIVE DAMAGES THAT ARE JUST AND FAIR IN EQUATION TO THE DEFENDANTS' FRAUDULENT AND DELIBERATE MISCONDUCT TOWARDS PLAIN-TIFF UNDER COLOR OF LAW, AND PLAINTIFF'S RESULTING SUFFERING THEREFROM.

I declare under penalty of perjury that the foregoing is true and correct.

Signed this _____15_____ day of _____JULY_____ _____, 2018 .

_____Yorul Baptiste_____
(Signature of Plaintiff)

CONTINUATION OF PAGE ONE, DEFENDANTS.

4. J. MORONEY (CASE MANAGER)
5. M. RODARMEL (UNIT MANAGER)
6. HEATH (S.I.A)

CONTINUATION OF PAGE TWO, DEFENDANTS AND ADDRESSES.

4. L.J. ODDO (WARDEN)
   P.O.BOX 3500, WHITE DEER, PA, 17887

5. M. RODARMEL (UNIT MANAGER)
   P.O.BOX 3500, WHITE DEER, PA, 17887

6. HEATH (S.I.A)
   P.O.BOX 3500, WHITE DEER, PA, 17887

## CLAIMS AND CAUSES OF ACTION

1. On October 1, 2015, the xerox machine in the Education Department was being repaired, as well as the xerox machine in housing unit 2-A, where plaintiff was assigned sleeping quarters. While in the 2-A housing unit, plaintiff sought to get one copy of his civil complaint, which was subsequently assigned case number 5:15-cv-522-Oc-10PRL at a later date. Plaintiff approached Dr. Morris(PsyD), who's also the Coordinator of the Challenge Program and plaintiff's mental health care provider, and requested a copy of his legal documents attached with a BP-199 Form for the total of $3.30, which would be deducted from plaintiff's inmate account. Dr. Morris repeatedly stated that she would make the copy for free in the Psychology Department, while plaintiff waited in the 2-A housing unit while she, Dr. Morris, walked to psychology to make the copy. Plaintiff did not agree. Dr. Morris argued with plaintiff while she held plaintiff's civil complaint in her hands stating, "you don't trust me?" to which plaintiff responded, "I will not be seperated from my legal documents." Dr. Morris further insisted that she's only going to the Psychology office and that she will be right back. Plaintiff did not agree. Plaintiff then requested that Dr. Morris hand back his documents. Dr. Morris refused, then stated to plaintiff, "why don't you trust me, I'm Dr. Morris," to which plaintiff replied, "may I please have my documents," which Dr.- Morris reluctantly returned to plaintiff. Dr. Morris subsequently offered to take plaintiff with her to psychology to make the copy. While making the copy for plaintiff, Dr. Morris fed the feeder of the xerox machine with portions of plaintiff's documents while reading 'parts' of plaintiff's civil complaint. Plaintiff stated to Dr. Morris from the door way that she should not be reading plaintiff's legal documents to which Dr. Morris looked up and replied, "I'm sorry Mr. Baptiste. I can't let you win."

2. On October 10, 2015, a total of $3.30 was deducted from plaintiff's inmate account for the copy of plaintiff's civil complaint.

3. On October 13, 2015, plaintiff spoke to Dr. Lavertue(PsyD), after a prior e-mail. Plaintiff did not want to be on Dr. Morris's case-load to

(1)

which plaintiff explained to Dr. Lavertue that he, plaintiff, was un-
comfortable with Dr. Morris.

4. On October 15, 2015, plaintiff spoke to Dr. Mitchell, head psych-
ologist, about being taken off Dr. Morris's case-load. Plaintiff explained
to Dr. Mitchell that he was not comfortable with Dr. Morris as his Mental
Health Care Provider.

5. On October 19, 2015, while in the dining area at lunch time,
plaintiff submitted a Written Request to Dr. Mitchell about not wanting
to be in Dr. Morris's care any longer. Dr. Mitchell stated that plaintiff
needed to consult with Dr. Morris first.

6. On October 20, 2015, while in the 2-A housing unit, Dr. Morris
informed plaintiff that Dr. Mitchell said that he wants plaintiff to put
in to writing his "issues" and to submit it to him. Dr. Morris insisted
that plaintiff give her his "written issues" and that she would give it to
Dr. Mitchell.

7. On October 21, 2015, plaintiff personally submitted to Dr. Mit-
chell his "written issues" in a sealed envelope marked with "confidential,
for Dr. Mitchell only", while in his office in psychology.

8. On October 23, 2015, plaintiff spoke to Dr. Mitchell in psych-
ology, and Dr. Mitchell referred plaintiff to Dr. Morris by stating to
plaintiff that Dr. Morris is an educated and experienced psychologist.
Dr. Mitchell stated to plaintiff to give Dr. Morris a chance and speak to
her and that if things did not work out, then he would intervene.

9. On October 26, 2015, plaintiff was scheduled on the institution's
call-out for a meeting with Dr. Morris. Dr. Morris stated to plaintiff,
"you have to trust me, before we can start treatment."

(2)

10. On November 2, 2015, plaintiff was scheduled on institution's call-out for a meeting with Dr. Morris. Dr. Morris attempted to get plaintiff to talk about his civil complaint. Plaintiff stated to Dr. Morris, "you all are scaring me. I feel suppressed and you are forcing me to come down here. I feel bullied."

11. On November 9, 2015, plaintiff was scheduled on the institution's call-out for a meeting with Dr. Morris. Dr. Morris stated that plaintiff was "paranoid" and further stated, "In order for treatment to begin, you'll have to trust me." Plaintiff responded, "trust is earned and reciprocated, why should I trust you?" Dr. Morris responded, "because I'm the doctor."

12. On November 24, 2015, plaintiff was scheduled on the institution's call-out for a meeting with Dr. Morris. Dr. Morris inquired again about plaintiff's civil complaint and who it was on in particular. Plaintiff stated to Dr. Morris that staff at a previous institution harassed and discriminated against him because of plaintiff's sexual orientation.

13. On January 20, 2016, plaintiff was scheduled on the institution's call-out for a meeting with Dr. Morris. Plaintiff stated to Dr. Morris that he felt that he was being forced to meet with her and that he was previously and currently uncomfortable. Dr. Morris then requested that plaintiff write a letter about "his paranoia", to begin treatment, and submit it to her.

14. On January 25, 2016, plaintiff submitted the requested "paranoia" letter to Dr. Morris.

15. On February 14,2016, plaintiff requested from Dr. Morris via Tru-lincs e-mail copies and/or to review all assessment(s), report(s), and note(s) made from October 1, 2015 - January 31, 2016, from psychology file.

16. On February 16, 2016, Dr. Morris responded to plaintiff's e-mail stating that plaintiff will first have to fill out a Records Release (R.O.I) form to have access to the requested records.

(3)

17. On February 17, 2016, plaintiff filled out the (R.O.I) form and returned it back to Dr. Morris in the psychology department.

18. On February 19, 2016, plaintiff went to psychology to collect his requested records. Dr. Morris gave plaintiff 3 documents, one Administrative Note dated December 17, 2015, and two Clinical Contacts dated January 11, 2016, and February 9, 2016. Plaintiff then asked Dr. Morris, "is this all that's in my file?" and Dr. Morris responded, "yes." Plaintiff stated, "are you sure?" and Dr. Morris responded, "yes I'm sure."

19. On February 21, 2016, plaintiff submitted an Informal Resolution (BP-8) form to unit counselor Ms. Bowersox about Morris's misconduct.

20. On February 22, 2016, Dr. Morris responded to said BP-8 with total dishonesty.

21. On February 23, 2016, Dr. Morris responded to plaintiff's e-mail stating that plaintiff will meet with the Treatment Team on Friday (February 26, 2016).

22. On February 24, 2016, plaintiff submitted a BP-9 to Bowersox.

23. On February 25, 2016, Dr. Morris responded to plaintiff's e-mail about discussing private matters conducted in a therapuetic setting with the Treatment Team.

24. On February 26, 2016, plaintiff was present for a Challenge Meeting scheduled by Dr. Morris, which consisted of Treatment Specialist M. Reeves, R. Divers, and P. Kyle in attendance with Dr. Morris. Plaintiff became uncomfortable because Reeves and Dr. Morris perpetually repeated that plaintiff was "angry" and full of "angst." Plaintiff was then told by Divers that plaintiff's behavior was observed as being "stand-offish" and "angry" within the community which was cause for concern. Plaintiff stated that he was being attacked in the form of manufactured false observations.

(4)

Dr. Morris then stated to Plaintiff that Plaintiff sounded "very angry" in his e-mails. All Treatment Staff agreed with Dr. Morris's statement. Plaintiff stated to Treatment Staff and Dr. Morris that he was being singled out, targeted, and retaliated against because of his grievances against Dr.-Morris and Reeves prior to meeting. Plaintiff was then threatened by Divers about being transfered to a more violent penitentiary stating, "I read your file. You stabbed your cell-mate at Coleman. I think you like violence. Do you? Here you're safe, this is a safe environment. It's not Big Sandy, Hazelton, or Atwater." Plaintiff ceased communicating and Divers became frustrated by Plaintiff's silence and abruptly ended the meeting.

25. On February 29, 2016, while Plaintiff was locked in his assigned cell during the 4p.m. institutional stand-up count, Officer Cain asked Unit Officer Schrek to unlock Plaintiff's cell door, and then Cain asked Plaintiff name and register number. After reciting both, Cain told Plaintiff that medical wanted him now, (during the institutional count). Cain then escorted Plaintiff to medical but, before getting there, Plaintiff was intercepted by Lieutenant Valencik, who had Plaintiff pat-searched, and then instructed Plaintiff to follow him into the Officers Mess Hall, where it was dark. Valencik started to vigorously interrogate, harass, and threaten Plaintiff. Valencik stated, "what's your beef with Dr. Morris?" Plaintiff responded, "who told you I had a problem with Dr. Morris?" Valencik then asked Plaintiff what did he set out to accomplish from the grievance and was there anything that could be done for Plaintiff to make the 'problem' go away. Plaintiff stated "no." Valencik stated, "don't you like this yard? Don't you like the Challenge Program? I would like to see you stay there and graduate but you have to stop." Valencik further stated that Heath told him to relay to Plaintiff that Plaintiff should "tone it down." Valencik then stated that Plaintiff sounded "very angry" in his e-mails to Dr. Morris. Valencik stated, "If you do not stop, you can be placed in segregation, under investigation, and shipped."

26. On February 29, 2016, Plaintiff e-mailed warden Oddo's office and reported the events of what happened in Officers Mess Hall. Oddo responded on March 3, 2016.

27. On March 1, 2016, Plaintiff reported the events of February 29, 2016, to Dr. Mitchell. Dr. Mitchell responded on March 7, 2016.

28. On March 3, 2016, Plaintiff was instructed by Officer Garrison to report to the lieutenant's office. Once there, Plaintiff was pat-searched, instructed to remove his boots and coat, and to enter the holding tank. Plaintiff was eventually released from the holding tank an hour later and instructed to put on his boots and proceed to the Captain's office. Captain Feltman spoke about Plaintiff's e-mail to the warden's office. Feltman stated that he did not owe Plaintiff any explanation whatsoever, but that he was willing to explain why Valencik had Plaintiff in the Officers Mess Hall during the 4p.m. institutional stand-up count. Feltman stated that it was for Plaintiff's safety that Valencik summoned Plaintiff into the Officers Mess Hall with the lights off, so other inmates would not assume that Plaintiff was assisting (S.I.S). Plaintiff stated to Feltman he was threatened by Valencik and at some point he'd have to exit the Officers Mess Hall in full view of the inmate population going to main-line and that such a "meeting" could have been executed at the lieutenant's office where all staff/inmate meetings are held. Plaintiff further stated that all movement during the 4p.m. count is strictly prohibited for "security" reasons and that the only movement that would occur at that time is a medical emergency. Feltman ignored this and stated, "It's your right to file a grievance, but you will not threaten my staff." Feltman further stated that Plaintiff sounded "angry" in his e-mails to Dr. Morris and that Plaintiff should "tone it down." Feltman stated that Plaintiff's e-mail was threatening as explained to him by Dr. Morris. Plaintiff then requested of Feltman to provide the alleged threat Plaintiff made to Dr. Morris. Feltman responded, "that's immaterial, it doesn't matter." Feltman then stated to Plaintiff that if any of his staff interprets anything Plaintiff communicates as a threat, then Plaintiff is gone. Plaintiff became fearful of communicating with staff that he could be lied on and/or set up.

29. On March 2, 2016, March 3, 2016, March 4, 2016, March 11, 2016, March 18, 2016, March 21, 2016, March 23, 2016, and March 25, 2016, Reeves commenced a non-stop campaign of harassment with discriminatory remark(s) and/or statment(s).

(6)

30. On March 7, 2016, Plaintiff was prescribed 15 mg. Buspirone after consulting Dr. Mitchell, Chief Psychologist, which he recommended to Dr.-Holtzapple for Plaintiff's anxiety and hypersensitivity, as stated by Dr.-Mitchell.

31. On March 18, 2016, Reeves informed Plaintiff of Dr. Morris's decision to exclude Plaintiff from (Violence Prevention) module group. Reeves also issued a "formal warning" to Plaintiff stating, "if there are any more incidents, you will be removed from the Challenge Program." Plaintiff asked Reeves, "what incidents are you talking about? I haven't done anything wrong." Reeves responded, "you know damn well what I'm talking about. Stop pursuing Dr. Morris with your grievances."

32. On March 24, 2016, Plaintiff submitted two Informal Resolutions (BP-8) forms to unit counselor Ms. Bowersox against Reeves and Dr. Morris.

33. On March 25, 2016, Reeves entered Plaintiff's assigned cell with violent force opening the cell door with a threatening and angry look on his face and spoke to Plaintiff with a threatening tone and stated, "why did you go and tell Dr. Morris I called you a faggot, you damn sissy? Couldn't you face me like a man?" Plaintiff responded, "you did call me a faggot." Reeves responded, "I guarantee you won't win this one. I don't care who you run to and tell."

34. On March 28, 2016, Plaintiff was scheduled for a 10:30 a.m. Challenge Meeting on the institution's call-out. As Plaintiff was going to his assigned work detail, Reeves stated to Plaintiff, "you know you have a call-out." Plaintiff responded, "you all know that I work Sunday-Thursday at Food Service and failure to show up for work will result in disciplinary action." Reeves stated, "so you're not going to your call-out?" Plaintiff responded, "you can reschedule me at an appropriate time that will not interfere with my work schedule because I have to go to work." Reeves stated, "fine, this will only take two minutes." Plaintiff was then informed by Reeves and Divers that he was being expelled from the Challenge Program for resistance to treatment.

(7)

**35.** From March 21, 2016, thru March 25, 2016, Plaintiff was not scheduled and/or assigned to any Treatment Group, nor Individual Counseling by Reeves on orders of Dr. Morris.

**36.** On April 4, 2016, Plaintiff was instructed to go to the lieutenant's office. Special Investigative Agent (S.I.A) Heath conducted a interview in the holding tank about Dr. Morris's falsifying and fabrication of information into the Psychology data System (PDS), and Reeves' threats and/or harassment with discriminatory statements and Divers' threats with both acts of retaliation. Heath documented Plaintiff's statements of Treatment Staff's reactions of Plaintiff's grievances the best he could. Plaintiff then stated to Heath that he was on his prescribed medication and that he was feeling drowsy and confused. Plaintiff requested to see Dr. Mitchell. Heath told Plaintiff to wait and that he was going to call Dr. Mitchell for Plaintiff. A moment later, a officer told Plaintiff to "cuff-up," and stated that Plaintiff was going to the Special Housing Unit (SHU). Plaintiff was subsequently provided an Administrative Detention Order, signed by lieutenant E. Klinefelter, and lieutenant J. Hart, stating that Plaintiff was pending an SIS investigation.

**37.** On April 7, 2016, Plaintiff inquired of the S.I.S investigation to Klinefelter and the reason for his (SHU) placement. Klinefelter responded, "you shouldn't have pissed Heath off, that's why you're here."

**38.** On April 10, 2016, Plaintiff spoke to lieutenant Mcmahan and asked him why he, Plaintiff, was under an S.I.S investigation and in the (SHU)? Mcmahan responded, "you fucked with the wrong guy."

**39.** On April 18, 2016, Valencik approached Plaintiff while Plaintiff was in the law library and stated, "we got your fucking ass now," while laughing at Plaintiff.

**40.** On May 4, 2016, Case manager Moroney informed Plaintiff that he was being transfered to another penitentiary.

**41.** Plaintiff subsequently requested and received a copy of his Transfer

(8)

Application through the Freedom of Information Act, "FOIA Request" Number: 2017-01936, which was signed by warden L.J. Oddo, Unit Manager M. Rodarmel, and Case Manager J. Moroney, which stated in section two; "Inmate Baptiste arrived at USP-Allenwood, PA, on May 4, 2015. Inmate Baptiste has not programmed as recommended and his adjustment to incarceration is poor."

42. Further, "FOIA Request" Number: 2017-01936 stated that Plaintiff's request for a copy of S.I.S investigation report pertaining to Plaintiff's (SHU) placement on April 4, 2016, to on/or about May 4, 2016, stated in part; "In response to your request for an SIS report, we located no records responsive to your request."

43. On October 9, 2015, Plaintiff received a Certificate of Completion for the Challenge Orientation Phase.

44. On December 23, 2015, Plaintiff received a Certificate of Achievment for Healing Infections (DVD).

45. On March 7, 2016, Plaintiff received a Certificate for successfully completing the Adult Continuing Education Class Econimics I.

46. While in the (SHU), Plaintiff did complete Audio Mindfulness 1/2 on May 14, 2016.

47. While in the (SHU), Plaintiff did complete Rec Push Packet Nutrition on May 14, 2016.

48. While in the (SHU), Plaintiff did complete SHU Eating To Win on Mav. 14. 2106.

49. On June 16, 2016, plaintiff was transferred to USP-Victorville, located in Adelanto, California, as his designated institution.

(9)

during an institutional lock down from a recent physical and violent race
riot between Mexican gang members and the Black inmates.

**50.** On August 24, 2016, plaintiff was approached by approximately eight
inmates while in his assigned cell, threatening physical violence because
of plaintiff's sex-offender status stating, "you need to get the fuck off
this yard now." Plaintiff did, out of complete fear for his safety and life,
immediately inform staff and was subsequently placed in the (SHU), for his
safety.

## CLAIM ONE: <u>FIRST AMENDMENT RETALIATION CLAIM</u>

**51.** The plaintiff incorporates the facts of paragraphs 1-50, here into
this CLAIM ONE, as if fully restated here now.

**52.** As a result, through a systematic threat of violence, threat of trans-
fer, intimidation, harassment, loss of program, loss of assigned work de-
tail, plaintiff did suffer adverse determinations because of his grievance
against Dr. Morris. Plaintiff was placed in the SHU, under investigation,
and transferred as threatened by staff. Plaintiff was reclassified on May 5,
2016, as a "Close Supervision" Case, (Transfer Code 323), and transferred
to a "more violent penitentiary" where plaintiff was subsequently met with
the threat of physical violence because of his status as a sex-offender. As
managers and contributors to plaintiff's Central File, staff knew the possi-
bilities and danger plaintiff would face because of his status as a sex-off-
ender. To achieve this, Moroney did increase plaintiff's Security Points
from 23 to 25, and his Custody Level from Medium to High. Plaintiff did not
commit any prohibited offense to prompt this negative alteration. Moroney,
Rodarmel, and Oddo did, and/or agreed to, with one another, to fabricate and
falsify plaintiff's Transfer Application with false statements to achieve
this unlawful and unconstitutional objective because plaintiff did not stop
pursuing his grievance against Dr. Morris. Plaintiff did receive good reports
from his supervisor, Officer Fazler, from Food Service. Dr. Morris did facil-
itate and document plaintiff's progress and behavior in the Challenge Program
from June 5, 2015, to February 12, 2016, as "Completed Session" for "Atten-

(10)

dance" and "Good" for "Participation." Plaintiff did not refuse and/or re-
sisted treatment prior to being expelled from the Challenge Program on
March 25, 2016. The Bureau of Prisons has maintained and did rely on Moro-
ney's, Rodarmel's, and Oddo's inaccurate, fabricated, and falsified infor-
mation and failed to correct and/or expunge that information which was used
to process plaintiff's transfer.

## CLAIM TWO: FIFTH AMENDMENT PROCEDURAL DUE PROCESS CLAIM

53. The plaintiff incorporates the facts of paragraphs 1-50, here into
this CLAIM TWO, as if fully restated here now.

54. As a result, Oddo, Heath, Rodarmel, and Moroney, knowingly and
willingly, directly and/or indirectly, colluded prior to, and/or on April 4,
2016, to have plaintiff placed in the SHU unjustifiably, as Valencik threat-
ened on February 29, 2016, held in Administrative Detention without notice
for SHU placement or hearing. Plaintiff had a right and staff had a corres-
ponding duty to provide plaintiff a hearing which comports with the minimum
requirements of due process. Plaintiff did not receive any notice and/or
any information at any time of why he was under an S.I.S investigation.
Plaintiff was not afforded an opportunity at any time to speak and/or to
defend himself, to be heard, in a proper and procedural manner to contest
any charges and/or violations brought against him, and/or to contest his SHU
placement and subsequent transfer. (1) Plaintiff was not afforded the right
to have a written copy of the charges; (2) Plaintiff was not afforded the
right to have a full-time staff member to represent him; (3) Plaintiff was
not afforded the right to call witness(es); (4) Plaintiff was not afforded
the right to be present throughout the hearing; (5) Plaintiff was not aff-
orded the right to make a statement; (6) Plaintiff was not afforded the
right to be advised of the DHO's decision; (7) Plaintiff was not afforded
the right to appeal the DHO's decision within 20 working days. Plaintiff was
not provided an explanation of the reason for his SHU placement and subse-
quent transfer and was denied an opportunity to respond. There was no peno-
logical legitimate reason for plaintiff's SHU placement and subsequent tran-
sfer.

(11)

Plaintiff's presence in the general population did not pose a serious threat
to life, property, self, staff, or other inmates, or to the security or
orderly running of the institution. Bureau of Prisons regulations states
that the warden may place an Inmate in Administrative Detention if (among
other reasons), an investigation of an Inmate is pending for protective
purposes. This regulation requires the warden to prepare an Administrative
Order "ordinarily within 24 hours, detailing the reason(s)" for SHU place-
ment. Plaintiff did not violate any prison regulation(s) nor request pro-
tection on May 4, 2016. According to documents received via Freedom of In-
formation Act Number: 2017-01936, there were no records located responsive
to plaintiff's request for S.I.S investigation report from April 4, 2016,
to May 4, 2016. As a premeditated course of action, it was already decided
by Oddo, and/or staff, to transfer plaintiff without affording him his pro-
cedural due process rights. Plaintiff was placed in Administrative Deten-
tion under a false pretense and/or appearance to achieve this unconsti-
tutional objective, which was triggered because of plaintiff's grievance
against Dr. Morris, which resulted in these adverse determinations.

**CLAIM THREE: <u>EIGHT AMENDMENT DENIAL OF MENTAL HEALTH TREATMENT CLAIM</u>**

**55.** The plaintiff incorporates the paragraphs 1-50, here into this
CLAIM THREE, as if fully restated here now.

**56.** Plaintiff did request mental health care prior to October 2, 2015,
which Dr. Morris, who was personally involved, did set out, with full in-
tention, to deny, and/or was deliberately indifferent to plaintiff's men-
tal health needs, by deceiving, coercing, and manipulating plaintiff by
scheme or device to utilize plaintiff's "Paranoia Letter," as he was in-
structed to write by Dr. Morris, on January 20, 2016, during a Clinical
Contact, which plaintiff did write and did submit to Dr. Morris on January
25, 2016, which Dr. Morris did use to falsify and fabricate Clinical Con-
tacts dated January 11, 2016, and February 09, 2016, and thereby denying
and/or deliberately indifferent to plaintiff with appropriate and adequate
mental health care and to plaintiff's right to adequate mental health treat-
ment. Plaintiff's injuries, as discussed with Dr. Morris during an undocu-
mented Clinical Contact, and his fears because of his homosexuality and the

(12)

abuse he's sustained, were never addressed in an adequate manner. Plaintiff
did express to Dr. Morris on one occasion that because of his homosexuality,
he, plaintiff, did not know how to express himself as a gay male, and lived
everyday in abject fear. Plaintiff was only given, by Dr. Morris, during an
undocumented Clinical Contact, the address to Black & Pink, an LGBTQ gay
newsletter to which plaintiff did subscribe to. Plaintiff's depression,
anxiety, fear, low self-esteem, and insomnia were never addressed by Dr.-
Morris.

57. Dr. Morris did not document plaintiff's respective Clinical Contacts
dated October 26, 2015, November 2, 2015, November 9, 2015, November 24,
2015, and January 20, 2016, as mandated in B.O.P policy, and in the American
Psychology Association's (APA's) Ethical Principles for Psychologist and
Code of Conduct, as well as the APA's guidelines for the professional prac-
tice of psychology, on record keeping into the Psychology Data System (PDS),
pertaining to plaintiff's undocumented Clinical Contacts from his request
for mental health care for Psychological Reports, Chronological Records of
Contacts, Treatment Plans, Therapy Notes, Brief Counseling and/or Other Con-
tacts. Dr. Morris did not document any information pertaining to plaintiff's
homosexuality and the injuries he sustained for the simple fact that she,
Dr. Morris, would not, and did not, clinically assess, plan, and treat
plaintiff with adequate mental health care. As stated in B.O.P policy 5310.
17(10)(A), in part; "other individual contacts are documented in PDS norm-
ally on the day they occur, or within three working days." Dr. Morris did,
however, create a Clinical Contact dated January 11, 2016, entered into
the PDS, which was falsified, fabricated, inaccurate, and not timely com-
pleted into the PDS which was approximately 30 days later, on February 10,
2016, in violation of B.O.P policy and the APA, as well as another similar
Clinical Contact dated February 9, 2016, which was also falsified and fab-
ricated by Dr. Morris.

58. Dr. Morris did instruct plaintiff to write a "Paranoia Letter,"
which plaintiff complied to, and submit to, Dr. Morris on January 25, 2016,
which resulted by scheme and directly related to both Clinical Contacts,
and the fact that Dr. Morris manipulated plaintiff's request for psycholo-
gical services to engineer her scheme and unlawful, and/or unconstitutional

(13)

objective of denying plaintiff adequate mental health care. Dr. Morris did disguise plaintiff's Clinical Contacts dated October 26, 2015, November 2, 2015, November 9, 2015, November 24, 2015, and January 20, 2016, as treatment opportunities but failed to treat plaintiff and failed to create Chronological Records of respective Contacts as they factually occurred. Dr.-Morris did violate Ethical Rules established by the APA by applying a "dual role" relationship as plaintiff's primary mental health care provider and the Challenge Program Coordinator and did further set out to, and did exploit plaintiff, by coercing plaintiff that he, plaintiff, should trust her, Dr. Morris, on several occasions, and that failure to trust her, could be grounds for plaintiff's removal from the Challenge Program. Aside from this threat, Dr. Morris did take advantage of plaintiff, and used coerced and illicited information from plaintiff in his "Paranoia Letter," so she, Dr.-Morris, can adversely use against plaintiff in both of her falsified and fabricated Clinical Contacts.

59. As a result, Dr. Morris did not document into the PDS the fact about plaintiff's injuries stemming from the fact of his homosexuality which plaintiff did discuss with Dr. Morris and the fact that plaintiff sought treatment for this specific reason which Dr. Morris did act with deliberate indifference to assess, evaluate, and treat plaintiff with adequate mental health care. Dr. Morris did, with intent, failed to address, and/or respond to, in documented form, all subjects of plaintiff's homosexuality which Dr.-Morris did exclude from the record of the PDS, for both Clinical Contacts, thereby covering up her unlawful conduct which resulted in plaintiff's denial, and/or inadequate mental health care by Dr. Morris's deliberate indifference, which resulted in plaintiff's on-going suffering from severe depression, severe anxiety, and difficulty sleeping.

## CLAIM FOUR: <u>EIGHTH AMENDMENT FAILURE TO ACT AND/OR INTERVENE CLAIM</u>

60. The plaintiff incorporates the facts of paragraphs 1-50, here into this CLAIM FOUR, as if fully restated here now.

61. As a result of plaintiff's grievance and the steps he'd taken through the appropriate channels for redress, for which he did suffer retaliation from staff, Oddo knew that plaintiff was not present in Dr. Morris'

(14)

office on January 11, 2016, and February 9, 2016, which did reveal two fal-
sified and fabricated Clinical Contacts. A review of the CCTV, which was
not mentioned, as part of his investigative requirements, to properly invest-
igate plaintiff's allegations of not being present in Dr. Morris's office
on January 11, 2016, and February 9, 2016, Oddo provided no indication of
procedurally investigating with supportive facts to subsatntiate his response.
Oddo did not state any factual findings and chose to help cover up Dr. Morris'
unlawful acts by stating, "the Psychology Data System finds that you did in-
deed meet with the Challenge Coordinator on January 11, 2016, which the
Challenge Coordinator also confirms in person." The PDS only records what
date and time an entry, the contents of an entry, was entered into the PDS
by the author. The PDS system cannot confirm any physical meeting(s) that
may or may not have taken place. Oddo was informed by plaintiff of all acts
and measures of retaliation that staff did take against plaintiff and re-
mained indifferent. Plaintiff did inform Oddo of being threatened by Diver's,
harassed by Reeves, threatened, harassed, intimidated, and interrogated by
Valencik, which plaintiff was removed from his assigned cell during the 4p.m.
stand up institutional count, deceived about medical wanting to see him, and
ended up in the Officers Mess Hall with the lights off. Plaintiff was further
threatened by Feltman. Oddo, who was aware of this, intentionally failed to
act and/or intervene to protect plaintiff and did enter into a scheme to get
**plaintiff** transferred. Oddo would not, and did not, take any steps and/or
measures to stop his staff from being retaliatory towards plaintiff and pro-
vide provide plaintiff with any assurance that he, Oddo, would step in, un-
biasly investigate, and cease his staff's retaliatory actions. Oddo did de-
ny plaintiff safety, and disregarded his allegations with a pseudo investi-
gation and did not provide and/or enforce any measure of protection, as his
duty, for plaintiff, who did not do anything wrong. Plaintiff did suffer an
adverse determination because of his grievance against Dr. Morris which tri-
ggered this blatant cover up and Oddo's failure to act and/or intervene.

## CLAIM FIVE: <u>FEDERAL CIVIL CONSPIRACY CLAIM</u>

62. The plaintiff incorporates the facts of paragraphs 1-50, here into
this CLAIM FIVE, as if fully restated here now.

63. As a result, Dr. Morris, Divers, Reeves, Valencik, Feltman, Oddo,

(15)

Rodarmel, Moroney, and Heath, at some point or another, and/or prior to
April 4, 2016, after plaintiff commenced his grievance against Dr. Morris,
staff did collude together, and/or amongst one another, and/or to other
staff, and agreed to, in accordance, and/or in concert, with malice, by con-
spiring to have plaintiff placed in the SHU, and transferred as an end re-
sult of their threats. On February 24, 2016, plaintiff did appeal (BP-9), to
Oddo's office, which was received on February 26, 2016, and assigned remedy
number 853236-F1. On February 29, 2016, Valencik did have plaintiff removed
from his cell during the 4 p.m. stand up institutional count under the guise
that medical wanted to see him, and had him, plaintiff, brought to the Off-
icers Mess Hall instead, with the lights off, and did harass, intimidate,
interrogate, and threaten plaintiff about his grievance against Dr. Morris,
and did offer plaintiff an offering of a bribe, to make the "problem go away"
by stating, "what is it that you want?" and did also state that if plaintiff
did not stop, he could be placed in segregation, under investigation, and
"shipped." Oddo, and/or someone from his administration, did inform Heath
and Feltman, who in turn informed and/or authorized Valencik to carry out
his actions on February 29, 2016. When plaintiff did not stop pursuing his
grievance, on April 4, 2016, plaintiff was placed in the SHU, under investi-
gation, and subsequently "shipped" on May 31, 2016. On April 14, 2016,
Moroney did make his SHU rounds. When plaintiff inquired of Moroney the rea-
son of his pending S.I.S investigation, Moroney responded, "S.I.S won't tell
me shit about you." To commence plaintiff's transfer procedure, Moroney did
fraudulently, with malicious intent, alter plaintiff's Security Points from
23 to 25, and his Custody Level from Medium to High on his Custody Classi-
fication Form on May 5, 2016, with the agreement of Rodarmel and Oddo, who
directly participated, knowingly and willingly, with malice, and in concert,
with the fabrication and falsifying of plaintiff's Transfer Application,
which was provided to plaintiff via Freedom of Information Act Request #
2017-01936. Plaintiff was reclassified as a "Close Supervision" Case, for
institutional adjustment purposes, a Transfer Code 323 was applied, stating,
"Transfer to another High Security Institution deemed appropriate." Pursuant
to B.O.P policy, 5100.08, Transfer Code 323 is listed as a "Close Supervis-
ion" Case, "a result of an investigation that indicates a safety, security,
or escape risk. Includes verified and unverified protection cases." According
to "FOIA" Request # 2017-01936, there was no records located for an S.I.S

(16)

investigation. Plaintiff was not a safety, security, or escape risk. Plaintiff did not request protection on April 4, 2016. Further, on Transfer Application, it states, "Institution Adjustment: Inmate Baptiste arrived at USP-Allenwood, PA, on May 4, 2015. Inmate Baptiste has not programmed as recommended and his adjustment to incarceration is poor." This falsified and fabricated statement is false. Plaintiff earned a total of six certificates of completed programs/classes, and did work at Food Service to comply with BOP policy, Inmate Financial Responsibility Program, to contribute to his financial of court costs and/or restitution set in quarterly payments. This Transfer Application, dated May 5, 2016, was fraudulently created with falsified and fabricated statements, which was prepared by Moroney, and approved by, and/or agreed with, by Rodarmel and Oddo, knowingly and willingly, acted in concert, where all agreed with one another, for the common purpose, under unlawful conduct, with malice, to transfer plaintiff because he would not stop pursuing his grievance against Dr. Morris. To achieve these unlawful and conspitorial objectives, staff did commit plaintiff unjustifiably in the SHU, with the intent on depriving him his due process rights with the premeditated goal of transferring plaintiff on, and/or prior to, April 4, 2016. Plaintiff did suffer an adverse determination because of his grievance against Dr. Morris, where staff did conspire against plaintiff by committing him to a retaliatory transfer to a "more violent penitentiary."

## CLAIM SIX: <u>VIOLATION OF 18 U.S.C 1001 CLAIM</u>

**63.** The plaintiff incorporates the facts of paragraphs 1-50, here into this CLAIM SIX, as if fully restated here now.

**64.** Reeves did, knowingly and willingly, falsified and fabricated Administrative Note dated February 26, 2016, with the objective of factoring in manufactured Treatment Interventions to cover up his retaliatory intent because of plaintiff's grievances against him and Dr. Morris, which was reviewed and approved of by Dr. Morris on March 9, 2016. Reeves did author a second Administrative Note, dated March 21, 2016, knowingly and willingly, entered into the PDS, after being confronted by plaintiff on March 21, 2016, of his exclusion for 60 Day Reviews. This Note was created by Reeves to cover up his lack of duty and his retaliatory objective against plaintiff because of his grievances.

(17)

65. Dr. Morris did fraudulently fabricate and falsify Clinical Contact dated January 11, 2016, into the PDS, and did also create the appearance that plaintiff's reported concerns surrounding his perceived mistreatment by BOP staff, stemmed from his "history of paranoia." Dr. Morris did also fraudulently fabricate and falsify Clinical Contact dated February 9, 2016, into the PDS, and also did create the appearance that plaintiff physically approached her, Dr. Morris, at 8:31 a.m., following Community Meeting, and requested another individual session, to discuss his mistreatment by staff at a previous institution. Plaintiff did e-mail Dr. Morris on February 9, 2016, at 6:37 p.m. Dr. Morris did create Clinical Contact dated February 9, 2016, at 8:31 a.m., and opened the Comments section with her adverse and injurious assessment, never openly acknowledging plaintiff's e-mail for documentative purposes, and the factual issues that plaintiff did in fact communicate to Dr. Morris, primarily about his homosexuality. Dr. Morris did complete her Comments section on February 10, 2016, at 8:37 a.m. Dr. Morris's timeline is inconsistent and contradictive to the established call out schedule to daily scheduled Community Meetings, which commenced at 9:50 a.m., and was concluded at recall, approximately 10:30 a.m. Dr. Morris stated in part on Clinical Contact dated February 9, 2016, "Met with Inmate Baptiste briefly following Community Meeting," at 8:31 a.m., which was completed on February 10, 2016, at 8:37 a.m. Plaintiff did not meet with Dr. Morris briefly following Community Meeting and request another individual session on February 9, 2016, at 8:31 a.m., or prior to that time. There was no scheduled Community Meetings at 8:31 a.m., and/or prior to that hour, as stated on page 11 of the Challenge Program Inmate Handbook. From 7:30 to 9:30 a.m., Mondays thru Fridays, excluding holidays, plaintiff physically participated in his assigned Module Group, which was (Violence Prevention), at that time. After plaintiff's Module Group was conducted, by Treatment Specialist P. Kyle, at 9:30 a.m., plaintiff, as well as all the assigned participants, had twenty minutes to set up for Community Meeting, for 9:50 a.m., in the chapel. When Community Meeting was concluded, at 10:30 a.m. recall, plaintiff went to his assigned work detail at Food Service. Dr. Morris did fraudulently create the appearance, with misleading statements on both Clinical Contacts, knowingly and willingly, falsified, fabricated, concealed, and covered up her unlawful scheme to adversely injure plaintiff's hope for redress for case number: 5:15-cv-522-Oc-10-PRL.

(18)

66. Moroney did prepare plaintiff's Transfer Application dated May 5, 2016, by committing fraudulent statements in Section Two and Three of Transfer Application. Further, Moroney did conduct a Program Review outside of plaintiff's presence dated May 4, 2016, prior to plaintiff's transfer. Moroney did also negatively alter plaintiff's Custody Classification Form by waiving plaintiff's remaining six months Management Variable, and increased his Security Points from 23 to 25, and his Custody Level from Medium to High, reclassified him as a "Close Supervision" Case for institutional adjustment purposes, to achieve this planned scheme and unlawful objective. Rodarmel did review Moroney's falsified and fabricated Transfer Application, approved of, and agreed with Moroney's scheme, and/or their collective scheme, by their respective signatures, of falsified and fabricated assessments, knowingly and willingly, with unlawful objectives and intent, then subsequently forwarded to Oddo, to finalize this fraudulent process by committing plaintiff to a Transfer Code 323, and did sign his signature as if officiating a valid and legal process, by way of concealing and/or covering up a material fact.

67. As a result, plaintiff did suffer an adverse determination by which the BOP failed to maintain, and/or correct, inaccurate records recorded into the PDS by Dr. Morris and Reeves, plaintiff's Transfer Application, Custody Classification, and Program Review, by Moroney, Rodarmel, and Oddo, all of which contained falsified, fabricated, and misleading statements, which was placed there with the intention to deceive and to prompt plaintiff's transfer in a retaliatory manner because of his grievance against Dr. Morris. The BOP did rely upon this information, and did transfer plaintiff to a "more violent penitentiary," which was the adverse consequence originating from his grievance against Dr. Morris.

## CLAIM SEVEN: PRIVACY ACT CLAIM

68. The plaintiff incorporates the facts of paragraphs 1-50, here into this CLAIM SEVEN, as if fully restated here now.

69. Dr. Morris, who was at the time the official manager and contributor of plaintiff's mental health records, who had direct access to the PDS, used her position and authority to deceive, falsify, fabricate, conceal by trick

or scheme, knowingly and willingly, and did set out and excluded from all Clinical Contacts/Individual Sessions and/or any and all information from plaintiff about his homosexuality and the injuries he sustained from all omitted meetings, which plaintiff was present for, by the scheduling of the institution's call-out on October 26, 2015, November 2, 2015, November 9, 2015, November 24, 2015, and January 20, 2016, and not January 11, 2016, and February 9, 2016, as purported by Dr. Morris, who intentionally failed to document the fact of plaintiff's homosexuality and the psychological harm caused thereof, to fully engage in her unlawful scheme of falsifying and fabricating both Clinical Contacts because of plaintiff's civil complaint, and to cause an adverse and/or unfair response as a result of plaintiff's previous lawsuit for case 5:15-cv-522-Oc-10PRL. As stated in paragraph 65, plaintiff did not meet Dr. Morris for a Clinical Contact on February 9, 2016, at 8:31 a.m., and/or prior to that hour. Dr. Morris, who facilitated plaintiff's "Group Participation" for his duration in the Challenge Program, recorded plaintiff's Treatment Sessions for Phase II Module Group, (Violence Prevention), from February 8, 2016, to February 12, 2016, as "Completed Sessions" for "Attendance" and "Good" for "Participation." Page Seven of the Challenge Program Inmate Handbook corroborates that Treatment Programming are two hours each, from 7:30 to 9:30 a.m. Page Nine and Eleven corroborates that Community Meetings begins at 9:50 a.m. Plaintiff could not, and did not meet with Dr. Morris "briefly following Community Meeting" at 8:31 a.m., and/or prior to that hour on February 9, 2016. There was no Community Meeting at that hour. At 8:31 a.m., and/or prior to that hour on February 9, 2016, plaintiff was at his assigned scheduled Module Group Treatment Session (Violence Prevention), which plaintiff did receive a "Complete Session" from Dr. Morris, who also facilitated and documented plaintiff's attendance and participation. These facts, which are undisputable, with supporting document evidence, proves that Dr. Morris did fabricate and falsify both Clinical Contacts dated January 11, 2016, and February 9, 2016.

70. As a result, plaintiff did suffer an adverse determination after the discovery of Dr. Morris's falsified and fabricated Clinical Contacts which the Bureau of Prisons did fail to maintain, correct, and/or expunge those inaccurate mental health records which contained falsified, fabricated, and misleading statements which was placed there by Dr. Morris with the full

intention, knowingly and willingly, to maliciously injure plaintiff's hope
for redress, and/or relief from his previous lawsuit against BOP employees.
After the discovery of these fraudulent records and the subsequent Admini-
strative Grievance which triggered a non-stop chronological order of retali-
ation by staff which included threats of transfer on Dr. Morris's behalf,
if plaintiff did not stop pursuing his grievance. These Clinical Contacts,
and all Administrative Notes that were authored by Reeves, reviewed and app-
roved by Dr. Morris, were all deliberate to create a false appearance of
plaintiff's "behavioral problems," and to cover up their retaliatory actions.
Both Clinical Contacts authored by Dr. Morris were maliciously engineered to
injure any hope that may have resulted from plaintiff's civil complaint,
which was not frivilous and redress was sought. Because of plaintiff's grie-
vance against Dr. Morris, plaintiff was placed in the SHU, under investiga-
tion, and transferred. As a result, plaintiff was reclassified as a "Close
Supervision" Case for institutional adjustment purposes, his Security Points
increased from 23 to 25, Custody Level from Medium to High, redesignated,
and subsequently transferred to a "more violent penitentiary," as threatened
by Divers on February 26, 2016, in Dr. Morris's Challenge Meeting after
plaintiff filed his grievance on February 21, 2016. Plaintiff did not violate
any prison regulations which would ordinarily prompt this administrative al-
teration. Moroney, Rodarmel, and Oddo did falsify and fabricate plaintiff's
Transfer Application and Custody Classification Form to punish him, plain-
tiff, for filing grievances against Dr. Morris. This Privacy Act violation
was deliberate. Plaintiff did suffer an adverse determination by being re-
classified, redesignated, and transferred to a "more violent penitentiary"
for failure to stop pursuing his grievance against Dr. Morris as plaintiff
was threatened by Divers, Valencik, and Feltman.

## CLAIM EIGHT: <u>PRIVACY ACT CLAIM</u>

**71.** The plaintiff incorporates the facts of paragraphs 1-50, here into
this CLAIM EIGHT, as if fully restated here now.

**72.** As a result, the BOP did rely upon these false, fabricated, and mis-
leading statements on plaintiff's Transfer Application, and Custody Classi-
fication Form conducted by Moroney, reviewed and approved by Rodarmel, and
forwarded to Oddo for final disposition purposes. Plaintiff did busy himself

while at USP-Allenwood by programming, (Institutional Activities/Educational
Courses), and worked without absence for his duration there in Food Service
to comply with his financial court obligations via BOP policy, Inmate Finan-
cial Responsibility Program, as a mandatory requirement of programming. The
BOP has failed to maintain, and/or correct these inaccurate records regard-
ing plaintiff's Transfer Application, Custody Classification, and Program
Review. As a result, which originated from plaintiff's grievance against
Dr. Morris, plaintiff was placed in the SHU, unjustifiably, reclassified as
a "Close Supervision" Case for institutional adjustment purposes, redesig-
nated, and subsequently transferred to a "more violent penitentiary."
Moroney did also negatively alter plaintiff's Security Points from 23 to 25,
and his Custody Level from Medium to High on May 5, 2016, which was the in-
ternal procedure used to commence plaintiff's retaliatory transfer. Plain-
tiff did not violate any prison regulation which would ordinarily prompt
this administrative alteration. Moroney, Rodarmel, and Oddo did fabricate
and falsify plaintiff's Transfer Application and Custody Classification to
punish him, plaintiff, because he did not stop pursuing his grievance
against Dr. Morris. This Privacy Act violation was deliberate. Plaintiff did
suffer an adverse determination by being reclassified, redesignated, and
transferred to a "more violent penitentiary" because of his grievance, as
he was threatened by Divers, Valencik, and Feltman.

(22)



Yonel Baptiste #83407-004
United States Penitentiary Beaumont
P.O. BOX 26030
Beaumont, TX 77720



CERTIFIED MAIL

7015 3010 0001 5745 7459

RECEIVED
SCRANTON

JUL 2 6 2018



PER _____ DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA
ATTN: CLERK OF COURT
235 NORTH WASHINGTON AVE.
P.O. BOX 1148
SCRANTON, PA, 18501-1148

INMATE MAIL BOX RULE,
PURSUANT TO FED. R. APP. P. 4(C)
ON THIS 16 DAY OF JULY, 2016